# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ROBERT GUY BAKER**, | No. 2:05-cv-01669-AK |
| Plaintiff, | |
| v. | **ORDER** |
| **SCOTT KERNAN**, | |
| Defendant. | |

Northern Hispanic and Southern Hispanic are rival gangs that operate within the California prison system.  The northerners are almost exclusively from northern California, and the southerners are almost exclusively from southern California.  Both groups are multiracial, but largely Hispanic or Latino.  They've been sworn enemies for decades and will attack each other on sight.  California State Prison, Sacramento (CSP-Sac) instituted a "modified program" to keep them apart, and the specific restrictions have been adjusted over the years.  When Baker was there, the groups were housed on opposite sides of a common facility, separated by a wall.  They were assigned to different yards and kept apart at all times except during visitation.

page 2

Baker was classified as a northerner and claims that the modified program denied him equal protection, due process and the right to be free from cruel and unusual punishment while he was at CSP-Sac.  See Second Amended Complaint (docket entry 19) ¶ 10.  He sued Kernan, the warden during part of his imprisonment at CSP-Sac, under 42 U.S.C. § 1983.  See id. ¶ 1.  In ruling on Kernan's motion for summary judgment, I've construed Baker's complaint liberally and drawn all reasonable inferences in his favor.  See Edwards v. Wells Fargo & Co., 606 F.3d 555, 557 (9th Cir. 2010); Baker v. Dep't of Navy, 814 F.2d 1381, 1382 (9th Cir. 1987).  Kernan has the initial burden of "pointing out . . . that there is an absence of evidence to support [Baker's] case."  Cline v. Indus. Maint. Eng'g & Contracting Co., 200 F.3d 1223, 1229 (9th Cir. 2000).  The burden then shifts to Baker to "go beyond the pleadings and identify facts which show a genuine issue for trial."  Id.  Baker didn't file the required response to Kernan's list of undisputed facts.  See L.R. 56-260(b).  The vast majority of those facts aren't challenged anywhere in Baker's pleadings.

## I.    The Modified Program

The modified program restricted the northerners' access to the main exercise yard and other areas on the southerners' side of the facility.  Baker challenges four

specific aspects of the program that made life more difficult for northerners like

him.  First, northerners had limited job opportunities because they could work only

on their own side of the facility.  Second, northerners were confined to a smaller

yard that allowed for fewer activities, and they were given slightly less recreational

time in order to accommodate a personnel shift change.  Third, northerners had

limited access to the canteen, laundry facilities and law library located off the main

yard.  Fourth, northerners could request a chaplain but weren't allowed into the

chapel, because it had an unsecured door leading to the main yard.  CSP-Sac later

established a rotating schedule allowing both northerners and southerners to access

the chapel.  Wallace Decl. (docket entry 106-9) ¶ 49.

Baker also challenges the visitation policy that applied to northerners and

southerners alike.  Members of both groups were permitted to use the visiting area

at the same time because the prison thought they were unlikely to attack each other

in front of their families.  See Defendant's Undisputed Material Facts (docket entry

106-2) (DUF) ¶ 57.  But guards still needed to search the inmates separately before

they entered and after they left the visiting area.  Close contact between the groups

in the search area posed a threat of violence, so CSP-Sac ended visiting hours early

for one group each time.  This was done on an alternating basis.  Id. ¶ 58.

## II.    Due Process and Eighth Amendment Claims

The modified program was a rational response to a legitimate security concern.  It preserved Baker's ability to exercise regularly outside, be considered for a job, use facilities off the main yard, meet with the prison chaplain and see visitors.  The policy, implemented to keep prisoners safe from each other, didn't enhance Baker's sentence in "such an unexpected manner as to give rise to protection by the Due Process Clause of its own force," or impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Ghana v. Pearce, 159 F.3d 1206, 1209 (9th Cir. 1998) (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).  Nor did it constitute cruel and unusual punishment under the Eighth Amendment.  See Wilson v. Seiter, 501 U.S. 294, 296–98 (1991).  The magistrate judge properly screened these claims (docket entry 20), and they are now dismissed.

## III.    Equal Protection Claims

Classifying prisoners by their gang affiliation doesn't trigger heightened scrutiny under the Equal Protection Clause.  See Dawkins v. McGrath, No. CIV S-03-1643 FCD EFB P, 2009 WL 5110668, at *9 (E.D. Cal. Dec. 18, 2009) (findings and recommendations adopted in full on March 1, 2010).  Nor was the modified

program based on race:  It applied equally to Hispanic and non-Hispanic

northerners, and didn't apply at all to Hispanics who steered clear of the Northern

Hispanic and Southern Hispanic gangs.  See Wallace Decl. ¶ 54; cf. Escalante v.

Hubbard, No. C 10-1583 RS (PR), at *5 (N.D. Cal. Nov. 22, 2010) ("[T]he

discussion of 'Northern Hispanics' at the disciplinary hearing had to do with the

name of [the] gang, not with a broad racial category.").  The visitation policy

applied to both northerners and southerners, two largely Hispanic gangs, but Baker

doesn't point to any evidence showing it was motivated by race or that other

inmates posing similar security concerns were treated better.  See Washington v.

Davis, 426 U.S. 229, 239 (1976) ("[O]ur cases have not embraced the proposition

that a law or other official act, without regard to whether it reflects a racially

discriminatory purpose, is unconstitutional solely because it has a racially

disproportionate impact.").

    CSP-Sac therefore needed only a reasonable basis for implementing the

modified program.  See Turner v. Safley, 482 U.S. 78, 89 (1987) ("[W]hen a

prison regulation impinges on inmates' constitutional rights, the regulation is valid

if it is reasonably related to legitimate penological interests."); see also Johnson v.

California, 543 U.S. 499, 510–11 (2005).  That basis is clear from the record:  The

policy advanced safety and order by preventing northerners and southerners from

violently attacking each other.  <u>See</u> <u>Dawkins</u>, 2009 WL 5110668, at *9.  A gang

investigator at CSP-Sac described the groups' long history of engaging in such

attacks, which continued even after the modified program began.  A group of

northerners once misrepresented their identity in order to access the main yard;

northerners and southerners assaulted each other immediately.  Wallace Decl.

¶ 52a.  On another occasion, a southerner engaged a northerner in "mutual combat"

outside the visiting area.  <u>Id.</u> ¶ 52c.  The next year, three southerners attacked and

"battered" a northerner, and prison guards had to use pepper spray and a baton to

get the situation under control.  <u>Id.</u> ¶ 52d.  CSP-Sac's modified program

successfully reduced incidents of violence between northerners and southerners,

but these violent episodes demonstrated the ongoing need to maintain physical

separation of the two groups.  <u>Id.</u> ¶¶ 50, 53.

     It doesn't matter that southerners ended up faring slightly better in some

aspects of confinement, so long as the distinctions had a rational basis.  Here they

did:  The prisoners <u>had</u> to be separated for security reasons, and that led to some

unavoidable inequalities because southerners (who vastly outnumbered the

northerners) were assigned to the larger of the two yards.  <u>See</u> DUF ¶ 18.  These

are the kinds of executive decisions as to which we defer to the prison authorities.

See Norwood v. Vance, 591 F.3d 1062, 1066 (9th Cir. 2010); Munoz v. Rowland, 104 F.3d 1096, 1098 (9th Cir. 1997).

Baker insists that the prison's visitation policy at least violated state regulations, but that alone is insufficient to sustain a suit under section 1983. See Barry v. Fowler, 902 F.2d 770, 772 (9th Cir. 1990); accord Ebmeier v. Stump, 70 F.3d 1012, 1013 (8th Cir. 1995) ("We take this opportunity to emphasize that violations of state laws [and] state-agency regulations . . . do not by themselves state a claim under 42 U.S.C. § 1983.  Section 1983 guards and vindicates federal rights alone.").

*          *          *

A few housekeeping matters:  I considered the objections Baker filed (docket entry 119) in response to Kernan's reply, and Kernan's motion to strike them (docket entry 120) is denied.  In November 2010, Baker requested leave to amend his complaint to include two memoranda showing that CSP-Sac recently tried to return several groups of prisoners involved in a race riot back to normal programming (docket entry 121).  Baker doesn't explain why it took him months to submit these documents, and they don't affect the outcome of his case in any event.  The documents shed no light on whether CSP-Sac imposed unreasonable

Page 8

conditions on Baker, or unreasonably discriminated against northerners while he

was there.  Baker's motion for leave to amend his complaint is therefore denied.

This renders moot Baker's request that I take judicial notice of the memoranda, as

well as Kernan's motion to strike (docket entry 122).  Baker's request for a copy of

the local rules (docket entry 34) is also denied as moot.

The modified program reasonably furthered CSP-Sac's legitimate interest in

limiting the danger posed by two rival gangs in the prison.  See Turner, 482 U.S. at

89.  Baker's claims fail as a matter of law, and Kernan's motion for summary

judgment (docket entry 106) is therefore **GRANTED**.


May 21, 2011

_____
**ALEX KOZINSKI**
Chief Circuit Judge
Sitting by designation